1   SCHIFF HARDIN LLP
    Antony S. Burt (Illinois Bar No. 019234)
2   233 South Wacker Drive, Suite 6600
    Chicago, IL 60606
3   Telephone:    (312) 258-5500
    Facsimile:    (312) 258-5600
4   aburt@schiffhardin.com

5   SCHIFF HARDIN LLP
    Robert B. Mullen (Bar No. 136346)
6   Nicole S. Kilgore (Bar No. 253072)
    One Market, Spear Street Tower
7   Thirty-Second Floor
    San Francisco, CA 94105
8   Telephone:    (415) 901-8700
    Facsimile:    (415) 901-8701
9   rmullen@schiffhardin.com
    nkilgore@schiffhardin.com

10

11  Attorneys for Plaintiff
    FEDERAL DEPOSIT INSURANCE
12  CORPORATION as Receiver for
    SONOMA VALLEY BANK

13

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                  SAN FRANCISCO DIVISION

17

18  FEDERAL DEPOSIT INSURANCE          Case No. 13 3834
    CORPORATION as Receiver for
19  SONOMA VALLEY BANK,                **COMPLAINT FOR NEGLIGENCE,
                                        GROSS NEGLIGENCE, AND BREACH OF
20              Plaintiff,             FIDUCIARY DUTY**

21  v.

22  MELVIN J. SWITZER, SEAN C.         **DEMAND FOR JURY TRIAL**
    CUTTING AND BRIAN MELLAND,
23
                Defendants.
24

25

26

27

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

Plaintiff, Federal Deposit Insurance Corporation, as Receiver for Sonoma Valley Bank ("FDIC-Receiver"), for its Complaint states as follows:

**INTRODUCTION**

1.      The FDIC brings this lawsuit in its capacity as Receiver for Sonoma Valley Bank of Sonoma, California ("SVB" or the "Bank") to recover over $12 million in losses that the Bank suffered on ten commercial real estate ("CRE") loans and one commercial line of credit ("LOC") (collectively, the "Loss Transactions") approved by the defendants between December 20, 2006 and December 17, 2008.

2.      The FDIC-Receiver asserts claims against three former officers and directors of the Bank ("Defendants") for breach of fiduciary duty, negligence, and gross negligence. One of the defendants, Melvin J. Switzer ("Switzer") was an officer and director of SVB and a member of both the Management Loan Committee ("MLC") and the Board Loan Committee ("BLC"). Another defendant, Sean C. Cutting ("Cutting") was an officer and director of SVB and a member of the MLC. Defendant Brian Melland ("Melland") was an officer of SVB.

3.      As officers and directors, Defendants were required to safeguard the financial soundness and stability of the Bank. Defendants had a duty to prudently manage the Bank and make good faith, informed decisions that were in the Bank's best interests. Moreover, Defendants were charged with the responsibility of operating and managing the lending function of the Bank, including ensuring compliance with the Bank's written loan policies and procedures (the "Loan Policy") and banking regulations and laws.

4.      Defendant Melland underwrote and recommended each of the Loss Transactions. Defendants Switzer and Cutting, as officers and members of the Bank's MLC, had direct responsibility for evaluating loan applications, reviewing and supervising Melland's underwriting, and making informed and independent recommendations to the BLC as to whether loan requests were in the best interest of the Bank. Defendant Switzer, as a BLC member, was responsible for exercising informed independent judgment in approving loans as a BLC member and for providing complete and accurate information to other BLC members. Defendants were

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 1 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1    required, among other things, to ensure that the Bank's borrowers were creditworthy, that there

2    was a clear, sufficient, and reliable repayment source, that the pledged collateral was adequate,

3    and that the loans they recommended and approved would not result in unreasonable and

4    imprudent risk to the Bank.

5        5.    In gross derogation of the duties that they owed to the Bank to engage in safe and

6    sound banking practices, Defendants, among other things:

7            (i)    failed to properly and prudently oversee SVB's lending function;

8            (ii)    failed to properly and prudently manage and preserve SVB's
             resources;
9

10           (iii)   failed to manage, conduct, and direct the business and affairs of
             SVB to ensure compliance with prudent banking principles;
11
             (iv)    improperly approved millions of dollars in poorly underwritten and
12           risky loans;

13           (v)    knowingly and/or recklessly recommended and approved loans that
             violated SVB Loan Policy and applicable federal and state regulations;
14

15           (vi)    knowingly and/or recklessly permitted poor underwriting in
             contravention of SVB's policies and reasonable industry standards;
16
             (vii)   extended credit to borrowers who were not creditworthy;
17
             (viii)  extended credit based on inadequate information about the financial
18           condition of prospective borrowers and guarantors and without adequately
             analyzing cash flow and other critical financial information;
19

20           (ix)    failed to exercise independent judgment when evaluating and
             approving the Loss Transactions; and
21
             (x)    approved and originated speculative commercial real estate loans
22           despite known adverse economic conditions in the applicable California
             real estate market.
23

24       6.    Instead of fulfilling their responsibilities to the Bank, Defendants repeatedly

25   disregarded violations of Bank Loan Policy, including violations on the face of the credit

26   memoranda and exhibits ("Credit Memoranda") that Melland prepared and recommended, and

27   Switzer and Cutting received prior to approving loans. Specifically, Defendants recommended

28   and approved the Loss Transactions in violation of Bank Loan Policy, loan underwriting

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 2 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1    requirements, and prudent lending practices, resulting in losses to the Bank of over $12 million.

2    As discussed more fully below, each of the Loss Transactions suffered from multiple and

3    egregious deficiencies that made the risk of loss clear at the time the loan was approved.[1] No

4    Defendant objected to or voted against any of the Loss Transactions.

5        7.    By recommending and approving the Loss Transactions despite their numerous

6    flaws, Defendants exposed the Bank to excessive and imprudent risks and thereby breached their

7    fiduciary duties to the Bank and acted with negligence and gross negligence. Defendants' actions

8    and inactions form the basis of their liability and were the direct and proximate cause of the

9    damages that SVB suffered and that the FDIC-Receiver now seeks to recover. Accordingly, the

10    FDIC-Receiver asserts claims for breach of fiduciary duty, negligence, and gross negligence

11    against all three Defendants.

12    **THE PARTIES**

13

14        8.    The Federal Deposit Insurance Corporation ("FDIC") is a corporation and

15    instrumentality of the United States of America established under the Federal Deposit Insurance

16    Act, 12 U.S.C. §§ 1811-1833(e), with its principal place of business in Washington, D.C. 12

17    U.S.C. § 1821(d). Pursuant to 12 U.S.C. § 1821(c), the FDIC was appointed Receiver for SVB

18    on August 20, 2010, following the Bank's closure by the California Department of Financial

19    Institutions ("CDFI"). Pursuant to 12 U.S.C. §§ 1821(d)(2)(A) and 1823(d)(3)(A), the FDIC-

20    Receiver succeeded to all rights, titles, privileges and claims of SVB and its stockholders, account

21    holders, and depositors, including, but not limited to, the right to pursue claims against the Bank's

22    former directors and officers, including those claims asserted herein against Defendants.

23        9.    SVB, a state-chartered bank, was closed by the CDFI on August 20, 2010, with

24    $337 million in assets. SVB was wholly owned by Sonoma Valley Bancorp ("Bancorp"), a

25    publicly traded one-bank holding company.

26

27

28

---

[1] This is not a collection action against the borrowers or guarantors on the Loss Transactions, but an action sounding in tort against Bank officers and directors for improperly underwriting, recommending, and approving the Loss Transactions.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1       10.    Switzer was President of SVB from April 1990 until January 17, 2008, and Chief

2 Executive Officer ("CEO") from April 1990 until February 2009. Switzer was a director from

3 1990, a member of the MLC from 1990 until at least January 17, 2008, a member of the BLC

4 from on or before January 1997 until the Bank failed, a member of the Board Audit Committee

5 ("Audit Committee") from November 2006 until the Bank failed, and Chairman of the Board of

6 Directors ("Board") from January 2008 until the Bank failed.

7       11.    Cutting was SVB's Chief Lending Officer ("CLO") from August 2003 until

8 February 2009, President from January 17, 2008 until the Bank failed, and CEO from February

9 2009 until the Bank failed. Cutting was a member of the MLC from August 2003 until the Bank

10 failed. He became a director in February 2008 and a BLC member in April 2009.

11       12.    Melland was Vice President and a Loan Officer from May 2003 until March 2010.

12       13.    Melland filed for bankruptcy in 2011 and his debts were discharged in bankruptcy

13 the same year. Accordingly, pursuant to 11 U.S.C. § 524(e), the FDIC-Receiver names Melland

14 as a nominal defendant solely in order to seek recovery on the applicable Directors and Officers

15 Liability insurance policy.

16
## JURISDICTION AND VENUE

17       14.    The Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331

18 and 1345, because actions in which the FDIC-Receiver is a party are deemed to arise under

19 federal law. 12 U.S.C. §§ 1819(b)(2)(A). This Court has supplemental jurisdiction over the

20 FDIC-Receiver's state law claims under 28 U.S.C. § 1367.

21       15.    This Court has personal jurisdiction over all the Defendants, who at all relevant

22 times were residents of California and conducted the Bank's business in California. This Court

23 has personal jurisdiction over each of the Defendants pursuant to California Code of Civil

24 Procedure sec. 410.10.

25       16.    Venue is proper in this district under 28 U.S.C. § 1391(b), because one or more of

26 the Defendants resides in this district and events and/or omissions giving rise to the claims

27 asserted herein occurred in this district.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 4 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1

2

## **FACTUAL ALLEGATIONS**

### A.    **Background**

3       17.    SVB opened for business on June 3, 1988, as a state-chartered bank located in
4   Sonoma, California. SVB was initially formed as a subsidiary of Napa Valley Bancorp. In 1993,
5   Napa Valley Bancorp sold its shares of SVB in a private offering, and SVB became an
6   independent bank. In or about March 2000, SVB formed Bancorp for the purpose of establishing
7   a single-bank holding company structure pursuant to a plan of reorganization. Bancorp acquired
8   all shares of SVB by exchanging them for shares of Bancorp. Bancorp was publicly traded on
9   Nasdaq until it was de-listed after SVB failed.

10      18.    SVB primarily focused on providing loans to small to medium-sized commercial
11  businesses, professionals, and upper middle to high income individuals in and around Sonoma,
12  California.

13      19.    Beginning in 2005, SVB began to rapidly increase its CRE portfolio. By 2008, the
14  Bank's CRE loans grew to 451 percent of risk-based capital. Many of the construction loans in
15  the CRE portfolio involved a developer known as Borrower A.[2] These loans funded CRE
16  projects outside of the Bank's primary service area of the Sonoma Valley.

17

### B.    **SVB's Loan Policy and Loan Approval Authorities**

18      20.    Loan underwriting is the criteria used to qualify borrowers and determine loan
19  pricing, repayment terms, repayment sources, and collateral requirements, among other things.
20  An effective loan underwriting process establishes minimum requirements for the information
21  and analysis upon which a credit decision is based. Loan underwriting standards define a bank's
22  desired level of creditworthiness for individual loans and provide uniform criteria for evaluating
23  loans with similar characteristics.

24      21.    Underwriting practices also encompass the management and administration of a
25  bank's loan portfolio, including its growth, concentrations in specific markets or borrowers,
26  lending area, written lending policies, and adherence to written underwriting policies. The

27

28  ───────────────
[2] The names of individual borrowers, entity principals and guarantors have been withheld to
preserve personal identifiable information.

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1  purpose of a loan approval process is to provide controls to ensure acceptable credit at loan
2  origination.

3      22.    Because adherence to underwriting standards controls loan quality and maintains
4  the integrity of a bank's loan portfolio, a failure to abide by such standards exposes the bank to
5  capital erosion caused by unsafe and unsound credit decisions.

6      23.    SVB's October 19, 2005, Loan Policy was in effect at the time most or all of the
7  Loss Transactions were recommended and approved. The Loan Policy established that:

8
9      (i)    All commercial loans required analysis of a) borrower and
   guarantor ability to pay, b) financial condition of the principals of
10  corporate borrowers, c) the proposed collateral, d) credit history of
   corporate borrowers and their principals, and e) the conditions surrounding
11  the loans.

12      (ii)    Current financial statements, including balance sheets and profit
   and loss statements, were required for corporate borrowers, while
13  individual borrowers were required to provide personal financial
   statements and current tax returns.
14

15      (iii)    Owner guarantees were required on all loans to closely held
   businesses, with personal guarantees, endorsements, or cosignatures
16  required from the principal owners or stockholders of closely held
   companies, LLCs and LLPs, together with current financial statements.
17

18      (iv)    Appraisals to determine value were to be performed by licensed
   independent appraisers approved by the Bank and on a list approved by the
19  BLC. Appraisals were to be kept current.

20      (v)    Loan-to-value ("LTV") ratios were limited to 65 percent for raw
   land loans, 75 percent for land development loans, and 80 percent for
21  commercial construction loans. "Value" meant the lesser of the actual
   acquisition cost or the appraised market value. With respect to a
22  construction loan, "value" was defined as the lesser of the appraised market
   value or the actual cost to construct the project, plus the contributed land
23  value.

24      (vi)    The amount of Bank loans to a single borrower was not to exceed
25  90% of the legal lending limit for loans to one borrower. All loans to the
   following entities would be deemed to be made to a single borrower: (a)
26  the borrower; (b) other parties or entities guaranteed by the borrower; (c)
   entities controlled by the borrower; (d) members of the borrower's
27  immediate household; and (e) any other party if the economic benefit of the
28  loan inures to the borrower.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 6 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

(vii) The amount of Bank loans secured by real property outside of the Bank's primary service area of the Sonoma Valley was not to exceed 15% of the Bank's real estate portfolio.

(viii) Loan officers were to avoid conflicts of interest in which the loan officer might benefit financially or personally because the loan is made.

(ix) "Undesirable" loans included loans for speculative purposes, loans where the Bank would be in any position other than first position, any loan in which the Bank could experience difficulty in servicing due to the complexity of the transaction, and loans to closely-held corporations or partnerships where the principals refuse to execute a personal guarantee.

(x) Renewals were to be accompanied by a reasonable plan to retire the obligation and current financial information, and generally were to be considered only if the borrower's financial condition had not deteriorated, the borrower was performing, the property had not materially declined in value, and no previously uncommitted funds were advanced.

(xi) The following actions were to be classified as a troubled debt restructuring unless there would be no negative impact on the Bank: (a) reduction of the interest rate; (b) extension of maturity date at a stated interest rate lower than market; (c) debt reduction; and (d) accrued interest reduction.

(xii) Loans were to be charged off when their collectability was sufficiently questionable that the Bank could no longer justify showing the loan as an asset on its balance sheet. Charge-offs on CRE loans were to be taken promptly.

24. Under the Loan Policy, the Bank's MLC and BLC were responsible for approving loans within their respective authorities. At the time most or all of the Loss Transactions were approved, the MLC consisted of the President and the Chief Lending Officer – Switzer and Cutting respectively, through January 17, 2008. The MLC was responsible for day-to-day implementation, administration, and monitoring of the Bank's Loan Policy, and was required to meet weekly or as needed to review and recommend to the BLC loans that exceeded the loan officers' approval limits and any exceptions to the Loan Policy. The MLC did not have independent lending authority beyond the President's individual lending authority, which peaked at $750,000 as of 2009. Defendants Switzer and Cutting, as MLC members, failed to keep minutes of MLC meetings.

25. The Loan Policy provided that the BLC be made up of five directors, though seven

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1  directors sat on the BLC at all relevant times. The BLC was required to approve lending
2  transactions that exceeded the lending limit of the President or the loan officer's approval limits,
3  new advances of funds or changes in existing loan terms for adversely graded or classified loans,
4  and any arrangements contrary to the Loan Policy. All of the Loss Transactions required the
5  MLC's review and recommendation, as well as the BLC's approval.

6        26.    For each Loss Transaction, Melland underwrote the loan and prepared the Credit
7  Memorandum that described the proposed transaction, including the credit terms, the value of
8  collateral, repayment sources, credit risks, and the borrower's and guarantor's financial
9  information, among other things. As CLO and member of the MLC, Cutting was responsible for
10  and customarily did review Melland's underwriting. Cutting was also responsible for making
11  informed and independent determinations as to whether the loans underwritten by Melland were
12  in the best interest of the Bank and whether they should be recommended to the BLC. Switzer,
13  who served at various times as President, CEO, and a member of the MLC and BLC, was also
14  responsible for reviewing Melland's underwriting, and for making informed independent
15  determinations as to whether those loans were in the best interest of the Bank and whether they
16  should be recommended to and approved by the BLC of which he was a member. Credit
17  Memoranda were required to accurately identify the borrower's current total liability to the Bank,
18  and the Credit Memoranda submitted to the BLC for approval were required to identify the
19  current legal and in-house limits on loans to one borrower.

20        27.    The Loan Policy emphasized the importance of legal lending limits to one
21  borrower, recognizing "the need to prevent excessive concentrations of credit exposure to any one
22  borrower or group of related borrowers." Under California law, the Bank's secured plus
23  unsecured borrowing limit for a single borrower was 25 percent of the sum of the shareholders'
24  equity, allowance for loan losses, capital notes, and debentures. CAL. FINANCIAL CODE § 1481
25  (formerly § 1221). Accordingly, the Bank revised its calculation of the legal lending limit to one
26  borrower and the in-house lending limit (90% of the legal limit) on a monthly or quarterly basis,
27  and presented them in writing to the BLC at each meeting.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 8 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

28. In gross derogation of their fiduciary and other duties as SVB officers and directors, Defendants violated lending limits to Borrower A and repeatedly failed to follow the other requirements of SVB's Loan Policy when originating, evaluating and approving loans. Their conduct constitutes multiple breaches of their fiduciary duties, negligence, and gross negligence, and directly and proximately caused the Bank's losses, in an amount to be determined at trial.

## C. The Eleven Loss Transactions

29. This action focuses on eleven Loss Transactions, comprised of ten CRE loans and one LOC, which together caused SVB to suffer more than $12 million in losses.

30. The Defendants recommended and approved these eleven Loss Transactions in violation of the Bank's Loan Policy and in disregard of prudent lending practices. Among other things, these Defendants were aware or should have been aware that they were recommending and approving the Loss Transactions with: (1) loans to one borrower in excess of Bank limits and/or legal limits; (2) stale or inadequate appraisals; (3) excessive LTV ratios; (4) lending to individuals or limited liability companies already heavily burdened by existing debt and with insufficient liquidity to repay the loans; (5) lending to borrowers with little or no equity invested in the financed project; (6) lending on projects outside the Bank's primary service area of the Sonoma Valley; and (7) inadequate analysis of borrower or guarantor global cash flows. Each of these Loss Transactions was entered into at a time when the Defendants knew or should have known that there were increasingly adverse economic conditions in the relevant real estate market.

### 1. The 132 Village Square Loans

31. In 2006, Borrower A sought to refinance part of a $43.8 million loan made by KeyBank, N.A. to 132 Village Square, LLC, an entity more than 90% owned by Borrower A. The KeyBank loan financed construction of a 228-unit residential and commercial condominium complex in Santa Rosa, California, called Park Lane Villas. The development was to be completed in two phases. Phase I, referred to as Park Lane Villas West, was to be 114

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 9 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1    condominium units in the western half of the project. Phase II, referred to as Park Lane Villas
2    East, was to be a mirror image of the Park Lane Villas West project. The Park Lane Villas
3    development was outside the primary service area of the Bank.

4         32.    At the time of the requested refinance, Borrower A had nearly exhausted the
5    Bank's lending limit to one borrower through a previous SVB loan of $6.1 million loan to a
6    company named SSE, LLC. This problem was circumvented by Borrower A's withdrawal from
7    the ownership of SSE and by Defendants allowing another guarantor to replace Borrower A as
8    guarantor on the SSE loan. Melland and Cutting presented the switch of guarantors in a
9    memorandum approved by the BLC on December 20, 2006, explaining that it would allow the
10   Bank "to work with Borrower A on other projects."

11        33.    At the BLC meeting on December 20, 2006 Melland presented a $3.345 million
12   loan to Borrower A's development company Menlo Oaks Corporation ("Menlo Oaks") for the
13   ongoing construction of Park Lane Villas. Defendant Cutting, as an officer and MLC member,
14   recommended approval of the loan. Defendant Switzer, as an officer and MLC member, either
15   recommended the loan or abdicated his responsibility to review the underwriting and to make an
16   informed recommendation to the BLC on the loan. The BLC, including Defendant Switzer,
17   approved the loan. The Credit Memorandum prepared by Melland inaccurately described the
18   purpose of the loan as providing "take out financing" on 12 newly constructed commercial
19   condominium units at Park Lane Villas West, secured by a first deed of trust on the units. The
20   loan was to be personally guaranteed by Borrower A, with monthly interest payments and a one-
21   year term. Two million dollars from the loan proceeds was to be used to pay down a portion of
22   the construction loan with KeyBank and an unidentified equity investor, and $200,000 was to be
23   used as an interest reserve to provide for interest payments while the properties were being sold.
24   Melland's Credit Memorandum failed to consider standard construction loan issues such as
25   remaining costs to complete the projects, timetables, plans or specifications. Defendants
26   underwrote, recommended, and approved the loan without requiring a construction loan
27   agreement, progress inspections, or other customary disbursement controls.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 10 -

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

1       34.    Melland's Credit Memorandum acknowledged that Borrower A could not support

2  the loan, stating that he "does not show the ability to fully service the debt personally when

3  factoring in his other obligations." Further, the Credit Memorandum presented facially stale

4  financial information for Borrower A, a 21 month old financial statement dated March 31, 2005,

5  with no indication that Melland had updated or verified his assets or income. This violated the

6  Bank's Loan Policy, which required that all personal guarantees be evidenced by a current

7  financial statement.

8       35.    Defendant Melland's Credit Memorandum also relied upon a facially unacceptable

9  appraisal, which valued units in the Park Lane Villas East property rather than Park Lane Villas

10  West units actually securing the proposed loan, and had been prepared for IndyMac rather than

11  SVB. The appraisal valued 12 different commercial condominiums in Park Lane Villas East "as

12  if completed" at $4,560,000. Assuming the Park Lane Villas West units had the same value and

13  were completed, the Credit Memorandum calculated the LTV at 73 percent. However, the Park

14  Lane Villas West condominiums securing the loan were not fully constructed when the loan was

15  approved.   Defendants' recommendation and approval of the loan without obtaining an

16  appropriate appraisal violated the provisions of the Loan Policy requiring all commercial real

17  estate property to be appraised, that the appraisal be "received in sufficient time to be analyzed

18  before making a final credit decision," and that the collateral for construction loans be valued as

19  the lesser of appraised market value or the actual cost to construct the project plus the contributed

20  land value.

21       36.    The $3.345 million loan secured by the 12 Park Lane Villas West condominium

22  units closed on or about January 11, 2007. Instead of the loan being made to Menlo Oaks Corp.

23  as approved by the BLC, another company owned by Borrower A, 132 Village Square, LLC

24  ("132 Village Square") was substituted as the borrower.  Further, the loan funds were

25  inappropriately disbursed in a manner different from that approved by the BLC.  KeyBank

26  received a payoff of $1,750,000, rather than the $2 million that was stated in Melland's Credit

27  Memorandum. Five hundred thousand dollars was disbursed to Borrower A's company, Menlo

28  Oaks and $866,422.25 was disbursed to 132 Village Square, another company controlled by

1    Borrower A. Defendants recklessly structured the loan in a manner that would provide Borrower
2    A with substantial sums of unrestricted cash.

3         37.    Despite the improprieties in the first loan to 132 Village Square, on or about
4    February 6, 2007 the Defendants recommended a second loan to 132 Village Square, LLC for
5    $8.81 million, with other banks participating. At the BLC meeting on February 7, 2007 attended
6    by all Defendants, Melland presented and Switzer, as a member of the BLC, approved this loan.
7    Melland's Credit Memorandum inaccurately described the loan as take-out financing on 28 newly
8    constructed residential condominium units in Park Lane Villas West. Defendants simultaneously
9    recommended, and Switzer as a BLC member approved, a $200,000 unsecured working capital
10   revolving line of credit to Menlo Oaks, identified by Melland as the general contractor for Park
11   Lane Villas. At the BLC meeting on March 14, 2007 attended by all Defendants, the BLC
12   approved, based on the Defendants' recommendation, an increase to the $8.81 million loan
13   secured by 28 condominiums, to a $12 million loan secured by 35 condominiums. The loan was
14   for one year with a six month extension option and personally guaranteed by Borrower A. The
15   stated purpose of the loan was to pay off mezzanine financing of $12 million provided by Fidelity
16   Real Estate Investments on Park Lane Villas West. Subsequently, on April 4, 2008, following a
17   recommendation by Melland and Cutting, the BLC approved a reduction in the loan amount to
18   $9.2 million, with SVB's retained share being $3.2 million. The collateral was reduced to 27
19   residential condominium units.

20        38.    Only after the second 132 Village Square loan was approved did Defendants
21   obtain an appraisal for Park Lane Villas West units. However, the appraisal was based on two
22   "extraordinary assumptions:" (1) "unit construction is completed as specified in the plans
23   provided to the appraisers by the developers as of April 1, 2007, the reported prospective date of
24   completion"; and (2) "the opinions of value . . . are based on the hypothetical assumption that the
25   units are developed as of the effective date of valuation of March 18, 2007." Defendants knew or
26   should have known that neither of these assumptions was valid, as Melland's Credit
27   Memorandum stated that the residential units were being completed and that the 12 commercial
28   condominiums securing the first loan still had final improvements to be made.

1        39.    As with the first loan to 132 Village Square, the Defendants were aware that the guarantor (Borrower A) was in difficult financial straits. Melland's Credit Memorandum indicated that Borrower A's assets were tied up in other real estate, and specifically warned "that in viewing the guarantor's cash flow reports, Borrower A does not show the ability to fully service the debt personally when factoring in his other obligations and other commercial obligations he guarantees." The Credit Memorandum also stated, "Borrower A does show a large net worth but smaller than desired liquidity." And this financial information for Borrower A was reported to be based on a financial statement dated June 30, 2006, but the financial information was *identical* to the information provided in the Credit Memorandum for the first 132 Village Square loan, though dated 15 months later (June 30, 2006 vs. March 31, 2005). As a result, Borrower A's financial information for the second loan failed to even include the first 132 Village Square loan of $3.345 million, thus rendering it obviously inaccurate to the Defendants. The Credit Memorandum contained no indication that Borrower A's assets or income were verified. Melland as the underwriter and Cutting and Switzer as reviewers of the Credit Memorandum knew or should have known the financial strength of the guarantor was in doubt but recommended and/or approved the loan anyway, violating the Bank's Loan Policy requiring acceptable owner guarantees of loans to LLCs and current financial statements from guarantors.

40.    Like the first loan to 132 Village Square, Defendants recommended and approved the second loan without material information regarding the loan structure, ownership structure, property condition, development schedule, or cost to complete the project being financed. Defendants underwrote, recommended, and approved the loan without requiring a construction loan agreement, progress inspections, or other customary disbursement controls.

41.    The unsecured $200,000 LOC to Menlo Oaks (at the time of the second loan to 132 Village Square) was another circumvention by Defendants of the Bank's LTV requirements. This line of credit was intended to provide working capital to complete the Park Lane Villas West project, and was thus indistinguishable in purpose from the other loans on the project.

42.    As closed, the two loans to 132 Village Square and the $200,000 LOC to Menlo Oaks totalled $6.745 million, which exceeded the Bank's in-house lending limit to one borrower

1    of $6,302,892. Melland, Cutting and Switzer all knew or should have known of the lending limits
2    violation as it was stated on the front page of the Credit Memorandum prepared by Melland.

3        43.    Shortly thereafter, on November 14, 2007, the Bank downgraded the 132 Village
4    Square loans from a risk rating of 3 to a risk rating of 4W. Under the Loan Policy, a rating of 4W
5    denotes increased scrutiny based on "newly obtained information which is initially perceived as
6    negative (e.g., deterioration in financial condition . . ."). After the downgrade, Cutting made
7    misleading statements about the Village Square loans at BLC meetings, informing the BLC on
8    January 16, 2008 that "All construction loans appear to be on track and none are of concern at this
9    point," and informing the BLC on February 20, 2008 that "Our customer, 132 Village Square, has
10   sold many condos," even though at the time, none of the condominiums financed by the Bank had
11   been sold.

12       44.    Defendants caused the first Village Square loan to be extended or renewed seven
13   times and the second Village Square loan three times. In all cases, the rationale for extension was
14   to grant the borrower additional time to refinance the project, sell or lease the units, or provide
15   updated financials. At the time of each extension, Defendants were, or should have been, aware
16   of the borrower's non-performance, the guarantor's lack of liquidity, and the lack of market
17   demand of units for sale or lease.

18       45.    Switzer signed several loan extension documents in his capacity as Bank officer,
19   approving a 90-day extension to the first loan on February 18, 2008 and 90-day extensions to both
20   loans on April 16, 2008. These two extension documents stated that SVB was preparing an
21   enterprise review of Borrower A. The Bank's outside loan reviewer Credit Risk Solutions had
22   recommended the enterprise review to the Board Audit Committee (on which Switzer sat) in
23   September, 2007, because of the Bank's large borrowing relationship with Borrower A and his
24   exposure to other construction projects, but the review was not timely undertaken or completed.
25   In addition to signing the several extensions, Switzer, as a member of the BLC and based on
26   recommendations by Melland and Cutting, approved a rate reduction for both loans on June 4,
27   2008; approved the splitting of the second Village Square loan into a new A loan and B loan
28   (with the B loan charged off and the interest rate on the A loan lowered from 9.00% to 3.00%) on

- 14 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1  December 17, 2008; and approved further extensions to the first loan on March 18, 2009 and
2  September 16, 2009.

3      46.    The numerous extensions were imprudent given the worsening financial condition
4  of the borrower and guarantor, and the material decline in value of the collateral property. The
5  splitting of the second loan and charging off only a portion of it, when the entire loan was non-
6  performing, violated the Loan Policy requirement to charge off loans as soon as "their
7  collectability is sufficiently questionable that the Bank can no longer justify showing the loan as
8  an asset on its balance sheet." Ultimately, the Bank recorded charge-offs of $1.995 million on the
9  first 132 Village Square loan, $2.409 million on the second 132 Village Square loan, and
10  $100,000 on the line of credit to Menlo Oaks.

11     47.    Despite clear deficiencies and warning signs that the 132 Village Square loans
12  were unsafe and unsound, Defendants negligently, grossly negligently, and in breach of their
13  fiduciary duties underwrote, recommended, and/or approved the three loans.

14     48.    Defendants' negligence, gross negligence, and breach of fiduciary duty with
15  respect to the two 132 Village Square loans and the LOC resulted in substantial damages, in an
16  amount to be proved at trial.

17

18          **2.    The Petaluma Greenbriar Loans**

19     49.    On December 19, 2007, Defendant Melland, with the recommendation of
20  Defendant Cutting, presented two separate $1.86 million loans to Petaluma Greenbriar
21  Investments 1, LLC ("Petaluma 1") to the BLC for approval. Defendant Switzer, as an officer
22  and MLC member, either recommended the loans or abdicated his responsibility to review the
23  underwriting and to make an informed recommendation to the BLC on the loans. The BLC,
24  including Defendant Switzer, approved the loans. These loans were the first two of six loans of
25  the same amount made by the Bank to various Petaluma Greenbriar entities between December
26  20, 2007 and April 8, 2008 (collectively the "Petaluma Loans"). The total amount advanced by
27  the Bank on the six loans was $11.16 million. The third and fourth loans were made to Petaluma
28  Greenbriar Investments 2, LLC ("Petaluma 2") and the fifth and sixth loans were made to

1  Petaluma Greenbriar Investments 5, LLC ("Petaluma 5"). The purpose of the six loans was to
2  pay off an existing mortgage estimated to be $1 million on each of six apartment buildings in a
3  low income rental complex, convert the rental units to condominiums for sale and provide cash-
4  out to the borrowers. Each of the six loans was interest-only and was secured by a first deed of
5  trust on the building, and included a $50,000 reserve. The property securing the Petaluma Loans
6  was outside SVB's primary service area.

7      50.    It should have been obvious to the Defendants that Borrower A would receive the
8  economic benefit from each of the Petaluma Loans. Borrower A was the primary owner of the
9  Petaluma properties until a restructuring occurred just prior to the Petaluma Loans. The guarantor
10  ("Guarantor 1") on the Petaluma 1 loans was the tax preparer for Borrower A's businesses.
11  Moreover, the Credit Memorandum for the Petaluma 1 loans identified Petaluma Greenbriar
12  Apartments, LLC ("PGA") as 49% owner of the borrowing entity, and BCG Petaluma, Inc.
13  ("BCG") as manager of PGA. Borrower A controlled both PGA and BCG, and the Petaluma 1
14  borrower was incorporated pursuant to an operating agreement recently entered into by Borrower
15  A and Guarantor 1.

16      51.    Defendant Melland's Credit Memorandum for the Petaluma 1 loans informed the
17  BLC that the in-house lending limit to one borrower was $6,880,913 as of November 30, 2007
18  and the legal lending limit to one borrower was $7,645,459. If the Credit Memorandum had
19  identified that the Petaluma 1 loans provided economic benefits to Borrower A, it would have
20  been evident to the BLC that approval of the Petaluma 1 loans would violate both the statutory
21  and Bank loans to one borrower limits.

22      52.    The Defendants were aware that there was insufficient cash flow from the property
23  securing the Petaluma 1 loans to repay the loans. The Credit Memorandum indicated that
24  repayment of the loans was primarily dependent on the buildings' low to moderate income
25  tenants electing, and being able, to buy the converted units "in the currently depressed market"
26  through ACORN financing. At the time they recommended and approved the loans, the city
27  authorities had not even approved a conversion of the property to condominiums. And
28  Defendants fully understood that "this is a tougher time for builders and developers, except for

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 16 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1  high-end," as Cutting stated at the December 19, 2007 BLC meeting. Despite being aware of
2  these risks, and despite the growing subprime crisis, Defendants failed to assess the viability of
3  ACORN financing for the current tenants and instead recklessly assumed that such financing
4  would be available and that the tenants would seek and obtain it.

5      53.    The Defendants were aware that the guarantor lacked the funds to make up any
6  cash-flow shortfall. Melland's Credit Memorandum for Petaluma 1 acknowledged that Guarantor
7  1 did not possess adequate cash flow to pay the loan. Moreover, the Credit Memorandum
8  provided no indication that Guarantor 1's reported assets or income were verified, no financial
9  information relating to PGA, no analysis of the borrower's ability to repay the loan, no historical
10 operating statements for the Petaluma Greenbriar apartments, and no information on the status
11 and cost of the planned condominium conversion.

12      54.    Nor was there an appraisal available to advise the Defendants of the value of the
13 property securing the loan. The appraisal supporting the Petaluma 1 loans was not even
14 completed until December 21, 2007—after the two loans were approved and closed. Instead, the
15 Credit Memorandum disclosed that the appraisal was in process and that based on an oral report
16 from the appraiser, the discounted value of each of the units would total $2,320,000 or an 80%
17 LTV for each $1,860,000 loan. However, once received this appraisal did not support an 80%
18 LTV ratio because the valuation was not "as is." Instead, the appraisal valued the property based
19 on "prospective market value upon completion of construction," employing the "extraordinary
20 assumption" that the condominium conversion and renovations were complete as of the effective
21 date of valuation.

22      55.    The Petaluma 1 loans closed on December 20, 2007. The loan proceeds directly
23 benefited Borrower A. In each loan, $1,186,422 was used to pay off the existing loan on the
24 property; a $156,000 "broker fee" went to the Borrower A-owned Prime Vest Realty, identified
25 on the Credit Memorandum as the property manager; $331,372.50 went to the Borrower A-owned
26 Menlo Oaks Corporation; a $65,000 payoff went to a business associate of Borrower A and sums
27 of $3,063.26 and $2,874.26 were used for defaulted and delinquent property taxes on the

28

1  underlying properties. The Credit Memorandum for Petaluma 1 had not disclosed that loan funds

2  would go to affiliates of Borrower A. Further, no money was held back for construction.

3      56.    On January 2, 2008, Melland recommended, and Switzer and three BLC members

4  approved the third and fourth Petaluma loans, to Petaluma 2, each in the amount of $1.86 million.

5  Melland prepared the Credit Memorandum for the Petaluma 2 loans. As officers and MLC

6  members, Switzer and Cutting either reviewed and approved Melland's underwriting in the Credit

7  Memorandum, or abdicated their responsibility to do so and make independent recommendations

8  to the BLC as to the Petaluma 2 loans.

9      57.    On April 4, 2008, Melland and Cutting recommended, and Switzer as a member of

10  the BLC, approved the fifth and sixth Petaluma loans to Petaluma 5, each in the amount of $1.86

11  million. Melland prepared the Credit Memorandum for the Petaluma 5 loans. Defendant Switzer,

12  as CEO, either reviewed and approved Melland's underwriting or abdicated his responsibility to

13  do so and to make an independent recommendation as to the Petaluma 5 loans to the other BLC

14  members.

15      58.    The Credit Memoranda for the Petaluma 2 and Petaluma 5 loans contained many

16  of the same facial deficiencies as the Credit Memorandum for Petaluma 1. The guarantor on

17  Petaluma 2 was a business partner of Guarantor 1. The guarantor on Petaluma 5 was identified as

18  Borrower A's sister and her husband. As with Petaluma 1, the Credit Memoranda for both

19  Petaluma 2 and 5:

20          (i)     Identified the structure of the borrowing entity as 49%
            owned by PGA and 51% owned by the guarantor, although
21          Borrower A's ownership of PGA or relationship to the guarantor
            was not specifically described (except for Borrower A's sister);
22
            (ii)    Failed to apprise the BLC of the violation of legal and Bank
23          lending limits because of the economic benefit received by
            Borrower A from the Petaluma loans;
24
            (iii)   Revealed that there was insufficient cash flow from the
25          financed property to repay the loan;

26          (iv)    Based a determination of 80% LTV on the same
            inappropriate appraisal used in Petaluma 1, which employed the
27          extraordinary assumption that the condominium conversion and
            renovations were complete;
28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 18 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

(v)    Contained no indication of asset or income verification of the guarantor, no financial information relating to PGA, no analysis of the borrower's ability to repay the loan, no historical operating data for the Petaluma Greenbriar apartments, and no information on the status and cost of the planned condominium conversion;

(vi)    Contained no conditions for the construction loan agreements, holdbacks, or any other restrictions on the cash being disbursed to the borrower; and

(vi)    Exceeded the Loan Policy limitation for out-of-primary service area lending.

59.    The Petaluma 2 loans and Petaluma 5 loans closed on January 7, 2008 and April 8, 2008, respectively. At closing, the loan proceeds of these four loans were disbursed nearly identically to the Petaluma 1 loans. All told, the Petaluma Loans resulted in approximately $3.2 million of unrestricted cash being funneled to Borrower A-owned companies at a time when Borrower A was at his borrowing limit at SVB. In addition, these loans paid off more than $7 million in loans at another bank that Borrower A had personally guaranteed. Defendants knew or should have known that substantial amounts of cash from the loans were being diverted to Borrower A without proper controls or restrictions and without the approval of the other BLC members.

60.    Taken together, Defendants caused SVB to lend $11.16 million secured by property in same low income property complex at a time when the Defendants were aware of the "current depressed market." This concentration of risk in the same property complex far in excess of the Bank's lending limits was highly imprudent.

61.    On January 21, 2009, Melland presented and Switzer, as a member of the BLC, approved two-year renewals of all six Petaluma Loans, even though, according to the Credit Memoranda recommended by Melland and Cutting, the collateral properties had declined in value to an estimated $1.8 million each, resulting in an LTV of 103%, the financial condition of the guarantors had deteriorated, and the lack of final map approval by the City prevented the properties from being converted to condominiums.

62.    The condominium conversions never occurred. By June 2010, the Bank charged off $1 million on each of the six Petaluma Loans.

63. Despite clear deficiencies and warning signs that the Petaluma Loans were unsafe and unsound, Defendants negligently, grossly negligently, and in breach of their fiduciary duties underwrote, recommended, and/or approved the loans.

64. Defendants' negligence, gross negligence, and breach of fiduciary duty with respect to the Petaluma Greenbriar loans resulted in substantial damages, in an amount to be proved at trial.

### 3. Personal Loan To Borrower A

65. On June 4, 2008, Melland and Cutting recommended, and Switzer, as a member of the BLC, approved a $1.25 million personal loan to Borrower A. As CEO, Defendant Switzer either reviewed and approved Melland's underwriting or abdicated his responsibility to do so and to make an independent recommendation to the other BLC members. The stated purpose of the loan was a cash-out short term "bridge" loan. According to the Credit Memorandum prepared by Melland, the loan funds would be used to pay down $100,000 in principal on the LOC to Menlo Oaks, to fund $340,000 for interest reserve for the two 132 Village Square loans, to fund slightly more than $100,000 in other unspecified interest and loan payments, and to provide $500,000 in cash to Borrower A personally.

66. At the time Defendants recommended and approved the loan, Defendants knew that Borrower A and his entities had insufficient cash flow to service existing loans, and that the continued refinancing or extensions of new credit was the only way the loans would not become delinquent. Defendants also knew that the sale of units in Borrower A's developments was the only potential future source of cash for repayment of any debt, yet the market was not supporting sales of those units.

67. The collateral offered for the personal loan was second position trust deeds on two of the Petaluma Greenbriar buildings, which was effectively worthless in light of existing first position mortgage liens on the buildings. Under the Loan Policy, this loan was considered to be "undesirable" because it was secured by a second mortgage on property. Further, the property was located outside the Bank's primary lending area.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 20 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1      68.    Defendant Melland's Credit Memorandum relied upon the flawed December 21,

2  2007 appraisal of the Petaluma property. Defendants' reliance on this appraisal was even more

3  suspect given that the Credit Memorandum stated that a weakness of the loan was "cash flow

4  challenges of the Borrower due to current real estate market" and that Borrower A's property

5  development company, Menlo Oaks, had no assets.

6      69.    At the time Borrower A's loan was approved, the Bank's in-house lending limit to

7  one borrower was $7,333,358 and the legal lending limit to one borrower was $8,148,176, and

8  was known to the Defendants as this information was clearly set forth on the Credit

9  Memorandum. When this loan was added to the $6.745 million in loans to 132 Village Square,

10  the loans directly to Borrower A exceeded the Bank's internal lending limits by over $600,000.

11      70.    In recommending and approving this loan, Defendants violated both the Loan

12  Policy and prudent lending requirements. This was essentially an unsecured loan to a borrower

13  who lacked the funds to repay the loan, and to whom Defendants had already loaned an excessive

14  amount of the Bank's money. Including Borrower A's economic benefit from the $11.16 million

15  Petaluma Loans, which was now clearly disclosed since Borrower A used the Petaluma property

16  as security for his personal loan, the California statutory loans to one borrower limit was violated

17  as well. Defendants did not inform the other members of the BLC that approval of the loan

18  would result in a violation of the Bank's statutory lending limit.

19      71.    Defendants imprudently recommended and approved an extension of the $1.25

20  million loan three months after it became due, then granted a second six month extension in

21  September 2009, extending the payment due date to February 23, 2010. In doing so, Defendants

22  committed further Loan Policy violations including failure to charge off loans whose

23  collectability is questionable.

24      72.    Ultimately, the Bank charged off the entire $1.25 million on the personal loan to

25  Borrower A.

26      73.    Despite clear deficiencies and warning signs that the personal loan to Borrower A

27  was unsafe and unsound, Defendants negligently, grossly negligently, and in breach of their

28  fiduciary duties underwrote, recommended, and approved the loan.

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- 21 -

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1    74.    Defendants' negligence, gross negligence, and breach of fiduciary duty with

2    respect to the personal loan to Borrower A resulted in substantial damages, in an amount to be

3    proved at trial.

4

5    **4.    The Cardoso Consulting Loan**

6    75.    In May 2006, Defendants caused the Bank to make an interest-only $2,450,000

7    loan to Cardoso Consulting, Inc., and eight individuals (the "Cardoso Consulting loan") to

8    purchase an .82 acre undeveloped parcel adjacent to Borrower A's Village Square project, outside

9    the Bank's primary service area. Borrower A's company, Menlo Oaks, was the seller of the

10   property and the individual purchasers and borrowers included an attorney for Menlo Oaks, his

11   wife, his brother, and his parents. The Credit Memorandum, prepared by Melland and

12   recommended by Cutting, did not identify the seller; and identified the sources of repayment for

13   the loan as the income of the borrowers, sale of collateral to developer, and liquidation of

14   collateral.

15   76.    Defendants renewed the Cardoso Consulting loan for a one year term in December

16   2007 without an updated appraisal. In May 2008, Defendants lowered the interest rate from 8.25

17   percent to 5 percent, to assist the borrowers with cash flow. An updated appraisal indicated a

18   value of $3 million, resulting in an LTV of 81 percent, substantially exceeding the Bank's LTV

19   limit of 65 percent for raw land loans.

20   77.    On or about December 11, 2008, Melland circulated a Revised Conditions to Loan

21   Approval memorandum, recommending that the loan be renewed and the individual borrowers be

22   released from their obligation to repay the loan. Although Melland stated that "personal

23   portfolios have deteriorated due to the current real estate market," he did not obtain or provide a

24   current financial analysis of the individual borrowers, whose non real estate assets in 2006 far

25   exceeded the loan amount. Melland also suggested that an unnamed third party would provide a

26   $200,000 interest reserve. At the BLC meeting on December 17, 2008 attended by all

27   Defendants, Melland acknowledged that one of the individual borrowers had financial strength

28

1    but stated that the individuals "wanted to be released" in exchange for arranging the interest
2    reserve, and had threatened to put themselves and the corporation into bankruptcy.

3        78.    On December 17, 2008, in gross derogation of their duties to the Bank, and in
4    violation of the Bank's loan policy, Melland recommended, and Switzer, as a member of the BLC
5    approved, a renewal of the loan and the release of all the individual borrowers. As President,
6    Cutting either approved or acceded to releasing these borrowers. Because Cardoso Consulting
7    was a single purpose entity with no income or assets other than the loan collateral, the release
8    essentially created a non-recourse loan. Defendants breached their duty of loyalty to SVB by
9    releasing Borrower A's attorney and his family members for inadequate consideration on the
10   Cardoso Consulting loan.

11       79.    Ultimately, the Bank charged off $1.41 million on the Cardoso Consulting loan.

12       80.    Despite the clear deficiencies and warning signs that the renewal and release of the
13   individual borrowers on the Cardoso Consulting loan was unsafe and unsound, Defendants
14   negligently, grossly negligently, and in breach of their fiduciary duties recommended and
15   approved the renewal and release.

16       81.    Defendants' negligence, gross negligence, and breach of fiduciary duty with
17   respect to the Cardoso Consulting loan resulted in substantial damages, in an amount to be proved
18   at trial.

19
20   **CLAIMS FOR RELIEF**

21   **Count I – Ordinary Negligence**
**(Against All Defendants)**

22       82.    The FDIC-Receiver realleges and incorporates by reference each of the allegations
23   contained in paragraphs 1 – 81 of this Complaint, as though fully set forth herein.

24       83.    As officers and directors of SVB, Defendants each owed the Bank a duty of care to
25   exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar
26   circumstances in the management, supervision, and conduct of the Bank's business and financial
27   affairs, including its lending practices.

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

84.     Also, each Defendant agreed and was obligated by statute, contract and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules and regulations, as well as all applicable policies, rules, and regulations of the Bank.    The Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound and prudent.

85.     Defendants are not entitled to the application of the business judgment rule because none of the Defendants' actions or inactions that are the basis of this negligence claim were taken in good faith, nor were the Defendants reasonably well-informed in taking such actions or inactions because each of the Defendants repeatedly underwrote, recommended and/or approved loans in violation of the Loan Policy, Parts 364 and 365 of the FDIC's Rules and Regulations, and/or the California Financial Code.

86.     As officers and directors of the Bank, Defendants had a duty to ensure that the Bank had adequate policies, procedures and internal controls relating to, among other things, CRE lending; adhered to its lending and credit policies, loan approval processes and loan and credit administration practices; complied with banking statutes and regulations; did not make imprudent loans and extensions of credit; and approved loans in compliance with Bank Loan Policy and prudent and sound lending practices.

87.     With respect to the Loss Transactions that they recommended and/or approved, each of the Defendants owed to the Bank duties that included, but were not limited to, informing himself about the proposed loans and the risks the loans posed to the Bank before recommending or approving the loan; recommending or approving loans that conformed with Bank Loan Policy; ensuring that any loans he recommended or approved were underwritten in a safe and sound manner; ensuring that any loans he recommended or approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and ensuring that any loans he recommended or approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

88.     As further detailed in this Complaint, Defendants failed to discharge their obligations to the Bank as described herein, breaching the statutory and common law duties that they owed to the Bank, and thus were negligent by, among other things:

(i)     Failing to analyze and assess the Loss Transactions in good faith and in an informed and deliberate manner;

(ii)    Failing to follow reasonable and prudent procedures for underwriting and monitoring SVB's CRE loans;

(iii)   Causing and/or allowing SVB to approve and fund loans in violation of SVB Loan Policy and applicable regulations;

(iv)    Causing and/or allowing SVB to approve and fund loans based on inadequate or wrongly valued collateral securing the loans;

(v)     Causing and/or allowing SVB to approve, fund, and renew loans without requiring adequate and reliable sources of repayment;

(vi)    Causing and/or allowing SVB to approve, fund, and renew loans without adequately analyzing the borrower's ability to perform on the loan and without adequately analyzing the ability of the secured property to support the loan;

(vii)   Failing to exercise independent judgment in connection with the review and approval of the Loss Transactions;

(viii)  Failing to inform themselves about the proposed loans and the risks the loans posed to SVB before they determined whether to recommend or approve them;

(ix)    Recommending and approving the release of individual borrowers affiliated with Borrower A for inadequate consideration;

(x)     Failing to properly supervise the lending function and lending program; and

(xi)    Failing to properly manage, direct, and conduct the business and affairs of SVB to ensure compliance with all applicable laws and regulations, and safe, sound, and prudent principles of banking.

89.     Each of the Defendants, during the period of time he was an officer of the Bank, was negligent in abdicating his responsibilities to the Bank as an officer, unreasonable in failing to investigate material facts, failing to carry out his responsibilities to the Bank by failing to act with appropriate care, including reasonable inquiry, as an ordinary prudent person in a like

position would use under similar circumstances, failing to act in good faith, ignoring the danger his negligence was causing to the Bank, negligently underwriting, recommending, and approving loans contrary to safe and sound banking practices, as further described in this Complaint, in connection with the Bank's commercial lending functions. These breaches of duty are exemplified by the Loss Transactions described herein.

90. As a direct and proximate result of the negligence of Defendants, the FDIC-Receiver suffered damages in an amount to be determined at trial, in excess of $12 million.

## Count II – Gross Negligence
### (Against All Defendants)

91. The FDIC-Receiver realleges and incorporates by reference each of the allegations contained in paragraphs 1 – 90 of this Complaint, as though fully set forth herein.

92. Section 1821(k) of the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821(k), provides that directors and officers of failed financial institutions may be held liable to FDIC receiverships for loss or damage caused by their "gross negligence," as defined by applicable state law. California law defines "gross negligence" as either a want of even scant care or an extreme departure from the ordinary standard of care.

93. As directors and officers, Defendants each owed the Bank a duty of care to carry out their responsibilities by exercising the degree of care, skill and diligence that ordinarily prudent persons in like positions would use under similar circumstances. This duty of care included, but was not limited to, the following:

(i) To inform themselves about proposed loans and the risks the loans posed to the Bank before they recommended or approved them;

(ii) To recommend and approve only those loans that conformed to the Banks' Loan Policy;

(iii) To ensure that any loans they recommended or approved were underwritten in a safe and sound manner;

(iv) To ensure that any loans they underwrote, recommended, or approved were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; and

(v)     To ensure that any loans they underwrote, recommended, or approved did not violate applicable banking regulations and/or create unsafe and unsound concentrations of credit.

94.     Each of Defendants, through their gross negligence, breached their duties of care by, among other things: causing the Bank to make CRE loans without proper analysis or consideration of the borrowers' ability to repay; failing to inform himself about or recklessly ignoring the risks that the proposed loans posed to the Bank; recommending or approving loans with terms inconsistent with the Bank's Loan Policy; failing to ensure that loans were underwritten in a safe and sound manner; failing to ensure that loans were secured by sufficiently valuable collateral to prevent or minimize the risk of loss to the Bank; violating banking regulations and statutes; creating unsafe and unsound concentrations of credit; failing to provide complete and accurate information to the BLC regarding proposed loans; recommending and approving the release of individual borrowers affiliated with Borrower A for inadequate consideration; and, failing to take action to prevent the reoccurrence of unsafe or unsound banking practices that came to his attention.

95.     In addition, Defendants breached their duties and were grossly negligent in connection with each Loss Transaction they recommended or approved, because they knew or should have known that each such loan involved one or more of the following characteristics, which increased the risk of default:

(i)     A violation of the Bank's in-house limit and/or the legal limit for loans to one borrower;

(ii)    An excessive LTV ratio, as measured by applicable regulatory standards and SVB's own Loan Policy;

(iii)   A deficient or incomplete appraisal, or an appraisal that deemed the loan unsound;

(iv)    A borrower or guarantor (or both) with excessive liabilities, or who otherwise lacked the financial wherewithal to service the loan;

(v)     Insufficient collateral;

(vi)    Improper use of interest reserves; and

(vii)   Relying on out-of-date or inadequate financial statements and/or appraisals without appropriate analysis.

COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY

96.     Each Defendant was grossly negligent in that his manner of carrying out his duties and responsibilities to the Bank constituted a want of even scant care or an extreme departure from the ordinary standard of care. Instead, Defendants acted with such a degree of carelessness and inattention to the performance of their duties as to constitute gross negligence under California law.

97.     Defendants' actions and inactions as described in this Complaint were not made in good faith or in an informed and deliberate manner.

98.     Defendants have breached their statutory and common law duties owed to the Bank, and as a direct and proximate result of the Defendants' gross negligence, the FDIC-Receiver suffered damages in an amount to be determined at trial, in excess of $12 million.

## Count III – Breach of Fiduciary Duty
## (Against All Defendants)

99.     The FDIC-Receiver realleges and incorporates by reference each of the allegations contained in paragraphs 1 – 98 of this Complaint, as though fully set forth herein.

100.    As SVB officers and directors, the Defendants occupied a fiduciary relationship with the Bank and owed the Bank a duty to act with the utmost good faith, honesty, and loyalty in the management, supervision, and conduct of the Bank's business, property and financial affairs.

101.    By their actions and inactions as described in this Complaint, Defendants violated their respective fiduciary duties to the Bank. Defendants clearly acted unreasonably under the circumstances known to them at the time, and otherwise wholly abdicated their corporate responsibilities by ignoring known risks, failing to act in good faith and did not act with the belief that their actions were in the best interests of the Bank. Defendants allowed the Bank's assets to be wasted by recommending and approving the Loss Transactions without adherence to the Bank's Loan Policy and prudent lending practices, and among other things, placed the interests of Borrower A and affiliated persons and entities above the interests of the Bank.

102.    As a direct and proximate result of Defendants' breaches of their fiduciary duty to the Bank, the FDIC-Receiver suffered damages in an amount to be determined at trial, in excess of $12 million.

1

**PRAYER FOR RELIEF**

2    103.    WHEREFORE, the FDIC as Receiver for Sonoma Valley Bank requests the entry

3    of a judgment in its favor and against Defendants as follows:

4            (i)    an award of damages, jointly and severally, in an amount to be
             proven at trial;
5

6            (ii)    an award of costs and other expenses recoverable in connection
             with this proceeding;
7
             (iii)    an award of prejudgment and post-judgment interest as allowed by
8            law; and

9            (iv)    such other and further relief as the Court deems just and proper.

10

11

     Dated: August _19_, 2013                    SCHIFF HARDIN LLP
12

13
                                        By: _Robt B. Mull_
14                                          Antony S. Burt
                                            Robert B. Mullen
15                                          Nicole S. Kilgore

16                                          Attorneys for Plaintiff FEDERAL
                                            DEPOSIT INSURANCE CORPORATION
17                                          as Receiver for SONOMA VALLEY
                                            BANK
18

19

20

21

22

23

24

25

26

27

28

SCHIFF HARDIN LLP
ATTORNEYS AT LAW
SAN FRANCISCO
                                        - 29 -
              **COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**

1

## JURY DEMAND

2          Pursuant to Federal Rule of Civil Procedure 38, the FDIC-Receiver demands a trial by

3     jury on all claims.

4

5     Dated: August __19__, 2013                    SCHIFF HARDIN LLP

6

7
                                                By: _Robert B. Mull___
8                                                   Antony S. Burt
                                                    Robert B. Mullen
9                                                   Nicole S. Kilgore

10                                                  Attorneys for Plaintiff FEDERAL
                                                    DEPOSIT INSURANCE CORPORATION
11                                                  as Receiver for SONOMA VALLEY
                                                    BANK
12

13    41485-0001
      CH2\13407542.2
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE AND BREACH OF FIDUCIARY DUTY**